IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LODGE NO. 5 OF THE FRATERNAL | : | CIVIL ACTION |
| ORDER OF POLICE, *By John McNesby,* | : | |
| *Trustee Ad Litem*, et al. | : | No. 11-3256 |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, et al. | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                    **February 21, 2013**

In this § 1983 action, Plaintiffs Lodge No. 5 of the Fraternal Order of Police (FOP), the

FOP's political action committee (COPPAC), and City of Philadelphia Police Officers David

Byrne, Shawn Carey, Jeffrey Seamon, and Les Baker challenge the constitutionality of a

provision of the Philadelphia Home Rule Charter prohibiting political contributions by members

of the Philadelphia Police Department (PPD). Plaintiffs allege the Charter provision violates

their rights of free speech and association under the First and Fourteenth Amendments of the

United States Constitution, their equal protection rights under the Fourteenth Amendment, and

similar rights under Article I, Sections 7, 20, and 26 of the Pennsylvania Constitution. They

bring these claims against the City of Philadelphia, Philadelphia Mayor Michael A. Nutter, the

Philadelphia Board of Ethics, Ethics Board Executive Director, J. Shane Creamer, and Board

members William H. Brown, Richard Glazer, Sanjuanita Gonzalez, Phyllis Beck, and Michael H.

Reed (collectively, "the City"). Plaintiffs seek an order declaring the Charter provision and

implementing Board of Ethics regulations unconstitutional and enjoining the City from enforcing

the ban on political contributions, as well as monetary damages.[1]  The parties have filed cross-motions for summary judgment.  For the following reasons judgment will be entered in favor of the City and against Plaintiffs.

**FACTS**[2]

The systemic political corruption that plagued Philadelphia City government, including its police force, in the first half of the twentieth century is well documented.[3]  Virtually every aspect of government was dominated by political party organizations.  By controlling the highest levels of City government, the party in power was able to build a "patronage army" of City employees, whose duty was to serve the party above all else.[4]  City employees, including members of the PPD, were critical to the party's electoral success both by getting out the vote, which included facilitating voter fraud, and by providing obligatory political contributions

---

[1] Plaintiffs represented to this Court at oral argument on the summary judgment motions that they have abandoned their claims for damages against any Defendant in his or her individual capacity, damages under the Pennsylvania Constitution, and punitive damages.

[2] Exhibits accompanying the parties' motions for summary judgment are identified by the name of the party and the exhibit number or letter as follows: e.g., Pls. Ex. 1; City Ex. A.  The exhibits accompanying the City's response brief are identified similarly as follows: e.g., City Resp. Ex. A.  Plaintiffs did not provide response exhibits.

[3] *See generally* City Ex. G, The Committee of Seventy, The Charter: A History (1980), *available at* http://www.seventy.org/Downloads/Policy_&_Reform/Governance_Studies/1980_-_Charter_ History.pdf (last visited Feb. 21, 2013) (hereinafter "Charter History"); City Ex. H, Expert Report by Elliot Shore (hereinafter "Shore Report").  This Court finds these historical reports to be well-researched and credible.  Moreover, Plaintiffs have neither objected to these reports nor questioned the veracity of any historical fact contained therein.

[4] Charter History at 2; *see also A Resolution Authorizing the Appointment of a Special Committee to Make Investigation Into the Campaign Expenditures of Candidates for the United States Senate: Hearing on S. Res. 215 Before Select Comm. on Senatorial Campaign Expenditures*, 71st Cong. 117 (1930) (testimony of S. Davis Wilson, Philadelphia County Deputy Comptroller).

referred to as "political assessments."[5]   On some occasions, especially in the early part of the century, police used brute force to secure election victories.[6]   One particularly infamous incident, which resulted in the conviction of six police officers, involved the beating of an opposition candidate and murder of a detective.[7]   In 1919, the City enacted reforms aimed at reducing corruption within government and the PPD.   One such provision forbade all police officers from coming within 50 feet of a polling place except to vote or when needed to make an arrest, after which the officers were required to "at once withdraw."   1919 P.L. 581 (hereinafter, "1919 Charter"), Art. XIX, § 23.   Another provision prohibited members of the Fire and Police Departments from making any political contributions.   *Id.*   While these efforts made small gains, the patronage system nevertheless persisted through the 1940s, begetting rampant corruption, including politician-sanctioned criminal enterprises facilitated by members of the PPD.[8]

The 1951 Philadelphia Home Rule Charter introduced more robust reforms to reduce public corruption, *see* Phila. Home Rule Charter §§ 10-100 to 10-111, also codified at 351 Pa. Code §§ 10.10-100 to 10.10-111, including sweeping restrictions on City employees' participation in political activities, *see* 351 Pa. Code § 10.10-107.   Section 10.10-107(3), modeled after the nearly identical provision in the 1919 Charter, prohibits City employees from

---

[5] Pa. Legis. Journal – Senate, May 7, 1919, at 1746 (statement of Sen. George Woodward); Charter History at 2; Shore Report at 1-4.

[6] Shore Report at 2-3 (recounting an incident where an opposition candidate who confronted City police officers for permitting blatant voter fraud at a polling place was violently removed by the officers and later had his complaint rebuffed by the Mayor).

[7] *See generally* City Ex. I, Maximillian Potter, *The Last Days of the Bloody Fifth*, Phila. Mag., Aug. 2000.

[8] Public Hearing of Philadelphia Charter Commission 28, Dec. 13, 1949 (testimony of Joseph S. Clark, Philadelphia City Controller); Charter History at 4, 8.

soliciting or collecting political contributions, and also provides:  "No officer or member of the Philadelphia Police or of the Fire Department shall pay or give any money or valuable thing or make any subscription or contribution, whether voluntary or involuntary, for any political purpose whatever."  *Id.* § 10.10-107(3).

In a 2003 decision, another court in this District found the ban on voluntary political contributions, as it applied to firefighters, violated the First and Fourteenth Amendments and enjoined its enforcement against uniformed employees of the Philadelphia Fire Department. *Phila. Fire Fighters' Union Local 22 v. City of Philadelphia*, 286 F. Supp. 2d 476 (E.D. Pa. 2003) (Dalzell, J.).  The City did not appeal that decision and has ceased enforcing the contributions ban against City firefighters, although it continues to enforce the ban against PPD employees.

In 2006, the Philadelphia City Council, with the Mayor's approval, passed an ordinance permitting payroll deductions for FOP members for the benefit of FOP's political action committee, COPPAC.  Phila, Pa. Bill No. 060181, codified at Phila. Code § 19-203.  The City, however, on the advice of the City Solicitor, refused to implement the COPPAC payroll deductions for PPD employees, concluding that such contributions would violate the ban in 351 Pa. Code § 10.10-107(3).  In March 2011, the Philadelphia Board of Ethics promulgated regulations implementing and interpreting § 10.10-107(3), which state PPD employees may not make any political contributions.  *See* Phila. Bd. of Ethics Reg. 8.8 ("An appointed officer or employee, except for an appointed officer or employee of the Police Department, may make contributions intended for a political purpose."), 8.14 (prohibiting Police Department members from making political contributions).

On May 18, 2011, Plaintiffs filed the instant lawsuit, asserting four separate claims. Count I alleges the ban on political contributions by PPD employees in § 10.10-107(3) and its implementing Board of Ethics regulations unlawfully infringes on Plaintiffs' rights to political expression and association in violation of the First and Fourteenth Amendments of the United States Constitution.  Count II alleges the ban also violates their right to equal protection of the laws under the Fourteenth Amendment because the City treats members of the Police Department differently than other City employees with respect to political contributions.  Count III alleges the City's failure to implement the COPPAC payroll deductions also violates their equal protection rights.  Count IV alleges the ban and the City's refusal to implement the payroll deductions also violate Plaintiffs' rights to free speech, free association, and the equal protection of the laws guaranteed by Article I, Sections 7, 20, and 26 of the Pennsylvania Constitution. Plaintiffs and the City filed motions for summary judgment, and oral argument was held July 11, 2012.

**DISCUSSION**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Material" facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  "On a motion for summary judgment, a district court must view the facts in the light most favorable to the non-moving party and must

make all reasonable inferences in that party's favor." *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).   The parties agree this case should be decided on summary judgment, as there are no disputed material facts.

The First and Fourteenth Amendments' protection of speech and association undisputedly extends to political contributions. *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 386-87 (2000); *see also Buckley v. Valeo*, 424 U.S. 1, 21 (1976) (noting "[a] contribution serves as a general expression of support for the candidate and his views" and "[m]aking a contribution, like joining a political party, serves to affiliate a person with a candidate").[9]  Although individuals do not relinquish their First Amendment rights by entering public employment, "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968); *accord United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 102 (1947) ("We have said that Congress may regulate the political conduct of Government employees 'within reasonable limits,' even though the regulation trenches to some extent upon unfettered political action."); *Reeder v. Kan. City Bd. of Police Comm'rs*, 733 F.2d 543, 547 (8th Cir. 1984) ("The Supreme Court has clearly stated that government may impose on its own employees rather substantial restrictions on political activity that is open without question to the citizenry at large."); *Gasparinetti v. Kerr*, 568 F.2d 311, 316 (3d Cir. 1977) (recognizing "the State has a greater interest in regulating the speech of public employees than in regulating the speech of citizens in general").  The constitutionality of a

---

[9] The First Amendment provides "Congress shall make no law . . . abridging the freedom of speech," U.S. Const. amend I, and has been applied to the states through the Fourteenth Amendment, *Gitlow v. New York*, 268 U.S. 652, 666 (1925).   "[F]reedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech."  *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958).

restraint on public employees' First Amendment freedoms, therefore, is determined by balancing the public and private interests implicated by the restriction. *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 465-68 (1995); *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers AFL-CIO*, 413 U.S. 548, 564 (1973) (hereinafter *Letter Carriers*); *Pickering*, 391 U.S. at 568.

The contributions ban in 351 Pa. Code § 10.10-107(3) is subject to review under the analysis set forth in *United States v. National Treasury Employees Union*, 513 U.S. at 468 (hereinafter *NTEU*).   The *NTEU* standard applies when a "generally applicable statute or regulation, as opposed to a particularized disciplinary action," restricts a government employee's expression on a matter of public concern. *Swartzwelder v. McNeilly*, 297 F.3d 228, 237 (3d Cir. 2002) (quoting *Latino Officers Ass'n, N.Y. v. City of New York*, 196 F.3d 458, 464 (2d Cir. 1999)).   Here, the City's ban on political contributions by PPD employees acts as a wholesale deterrent to an entire category of political expression which obviously concerns the public's interests. *See Phila. Firefighters Union*, 286 F. Supp. 2d at 481-82 (applying the *NTEU* standard to the contributions ban in § 10.10-107(3)); *see also Buckley*, 424 U.S. at 14-15 (recognizing political contributions are fundamental First Amendment activity akin to "the free discussion of governmental affairs" (quotation omitted)).

Applying the *NTEU* standard, the ban will be upheld only if the City can show that the interests of PPD members, and of the public, in PPD members' political contributions are outweighed by the City's interest in preventing those contributions' necessary impact on the actual operation of City government. *See NTEU*, 513 U.S. at 468.[10]   Furthermore, the City must

---

[10] The *NTEU* Court, in reviewing a law prohibiting federal employees from receiving payment for speeches or writings, held "[t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and

demonstrate the harmful effects of PPD employee contributions "are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 475 (quotation omitted). The Third Circuit Court of Appeals, in *Swartzwelder v. McNeilly*, observed that although *NTEU* did not explicitly set forth a tailoring requirement, "such a requirement seems to be implicit in the Court's discussion." 297 F.3d at 236; *see also NTEU*, 513 U.S. at 473-77 (invalidating a "crudely crafted" ban on honoraria for federal employees because the ban was not "reasonably necessary" to protect the government's interest and not "a reasonable response to the posited harms"). The *Swartzwelder* Court, applying the *NTEU* standard to a city policy prohibiting police officers from testifying as experts without authorization, went on to hold the policy likely violated the First Amendment as insufficiently tailored because it was "ill-suited" and "not carefully crafted" to serve the interests posited by the city. 297 F.3d at 238-40. The City, therefore, must also show the ban is "a reasonable response" to the harmful effects of PPD employee political contributions. *NTEU*, 513 U.S. at 473, 476.[11]

The interests of current and future PPD employees in making political contributions are significant but are nevertheless distinguishable from other kinds of First Amendment political

---

future expression are outweighed by that expression's necessary impact on the actual operation of the Government." 513 U.S. at 468 (internal quotations omitted).

[11] Plaintiffs argue the City's burden is even higher in this case because the ban is a "prior restraint" of speech. Indeed, a prior restraint on expression bears "a heavy presumption against its constitutional validity." *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (quotation omitted). But § 10.10-107(3) does not constitute a prior restraint. "Prior restraint" is a term of art "used to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (internal quotation omitted). Plaintiffs are correct that under *NTEU*, the City faces a greater burden in justifying a "statutory restriction on expression" than it would in defending "an isolated disciplinary action" arising from an employee's activity. 513 U.S. at 468. The *NTEU* Court, however, never characterized the statute banning honoraria in that case as a prior restraint, and did not apply the presumption of invalidity applicable to prior restraints. The ban at issue here likewise need not overcome this presumption.

expression.  On the one hand, expression concerning public issues, such as politics, "occupies the highest rung of the h[ie]rarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation omitted).  "The First Amendment affords the broadest protection" to political expression "in order to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Buckley*, 424 U.S. at 14 (internal quotation omitted).  In addition, the ability of PPD employees, through donations, to affiliate themselves with a political cause and pool their resources to further a common political objective falls squarely within the First Amendment's right of association.  *See id.* at 15, 22.  The Supreme Court has thus observed that a statutory restriction on campaign contributions "implicate[s] fundamental First Amendment interests."  *Id.* at 23; *accord Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 161-62 (2003).

On the other hand, although a monetary contribution by a PPD employee serves as a "general expression of support," this symbolic act "does not communicate the underlying basis for the support."  *Buckley*, 424 U.S. at 21.  "While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor."  *Id.*  Section 10.10-107(3) prohibits political contributions but does not prevent PPD employees from personally expressing the political views that would be presented as a result of those contributions.  As the Board of Ethics regulations make clear, PPD members may belong to a political party or partisan political group, Bd. of Ethics Reg. 8.13, and engage in a broad range of political expression and activity aimed at the success or failure of a party,

candidate, or political group, so long as the expression or activity is not in concert with a political party, candidate, or partisan political group, Bd. of Ethics Reg. 8.14.[12]

Moreover, the narrow definition of "political purpose" as it is used in § 10.10-107(3) permits PPD members to financially contribute to the advancement of countless causes that are undeniably political in nature.  As set forth in the Charter provision's implementing regulations, a "contribution intended for a political purpose" is any item of monetary value "received by a candidate or his or her agent for use in advocating or influencing the election of the candidate [or] . . . received by a political committee, political party, or partisan political group."  Bd. of Ethics Reg. 8.1(f).  A "partisan political group" is defined as "[a]ny committee, club, or other organization that is affiliated with a political party or candidate or whose primary purpose is to engage in political activity."  Bd. of Ethics Reg. 8.1(l).  "Political activity" is "[a]n activity directed toward the success or failure of a political party, candidate, or partisan political group," Bd. of Ethics Reg. 8.1(n), and the term "political" means "[r]elated to a political party, candidate, or partisan political group," Bd. of Ethics Reg. 8.1(m).  The ban is thus directed at partisan political contributions, and is not a prohibition on any contribution intended to advance a view relating to government.  Under § 10.10-107(3), PPD employees may still donate money and time to further their views on, for example, taxes, the proper role of government, and law enforcement

---

[12] Board of Ethics Regulation 8.14 provides the following examples of permissible political activity:

a. Publicly expressing an opinion on political matters or candidates, including in letters to the editor or on the internet;
b. Signing a political petition, such as a nominating petition, including those that are circulated by a political party, candidate or partisan political group;
c. Distributing political literature that was not created by a political party, candidate or partisan political group; . . . and
e. Attending political rallies, conventions, fundraisers or other political events solely as a spectator.

funding, and may contribute to organizations such as the Sierra Club, the National Rifle Association, and the Heritage Foundation.  Furthermore, Ethics Board Regulation 8.17 expressly permits the following "activity that is not political," and by inference permits contributions in furtherance of such activity, so long as it is not performed in coordination with a political party, candidate, or partisan political group: campaigning for or against local, state, and federal laws; circulating petitions related to such laws and other matters of public interest; and assisting in voter registration drives.  Bd. of Ethics Reg. 8.17.

While § 10.10-107(3) prevents PPD employees from associating with a political party or candidate through a financial contribution, they may still join groups to advance their political agendas.  The FOP is such an organization.  The FOP regularly endorses political candidates and publicizes its positions on legislative and executive matters.  Still, because the FOP—or, more precisely, COPPAC—cannot aggregate donations from current PPD employees to amplify their voices with respect to political candidates, the contributions ban considerably limits PPD members' associational freedoms.  *Cf. Buckly*, 528 U.S. at 387 (holding a contribution ceiling on the general public is not a significant restriction of associational rights because associations can still aggregate small contributions to amplify the voice of their membership).

In First Amendment challenges to political financial restrictions, "the level of scrutiny is based on the importance of the 'political activity at issue' to effective speech or political association." *Beaumont*, 539 U.S. at 161 (quoting *Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 259 (1986)).  The general differences between political contributions and direct political expression, as evinced by the instant ban, have led the Supreme Court to treat "restrictions on political contributions . . . as merely 'marginal' speech restrictions subject to relatively complaisant review under the First Amendment, because contributions lie closer to the

edges than to the core of political expression." *Id.* Thus, "instead of requiring contribution regulations to be narrowly tailored to serve a compelling governmental interest, a contribution limit involving 'significant interference' with associational rights passes muster if it satisfies the lesser demand of being closely drawn to match a sufficiently important interest." *Id.* at 162 (internal quotations omitted).

In *Buckley v. Valeo*, 424 U.S. at 35-38, and *Nixon v. Shrink Missouri Government PAC*, 528 U.S. at 397-98, the Supreme Court applied this less demanding standard to statutes imposing a ceiling on the amount an individual could contribute to a political candidate and held the government's interest in preventing corruption and the appearance of corruption justified the restriction on contributors' political expression. In *Federal Election Commission v. Beaumont*, 539 U.S. at 162, the Court held this same standard also applies to total bans on political contributions, noting "[i]t is not that the difference between a ban and a limit is to be ignored; it is just that the time to consider it is when applying scrutiny at the level selected, not in selecting the standard of review itself." The Court then proceeded to uphold the federal statute prohibiting direct campaign contributions by corporations based on the "deleterious influences" corporations can have on elections. *Id.* at 152.[13]   Of course, *Buckley*, *Nixon*, and *Beaumont* are not dispositive of Plaintiffs' present challenge, as the restrictions in those cases are significantly

---

[13] In *Citizens United v. Federal Election Commission*, 130 S. Ct. 876, 913 (2010), the Supreme Court reversed its prior decisions upholding bans on corporate independent expenditures; however, the Court did not alter the standard for reviewing restrictions on direct contributions to candidates, and did not disrupt the holding of *Beaumont*. *See id.* at 909 (noting "it has not [been] suggested that the Court should reconsider whether contribution limits should be subjected to rigorous First Amendment scrutiny"); *United States v. Danielczyk*, 683 F.3d 611, 615 (4th Cir. 2012) ("*Beaumont* clearly supports the constitutionality of [a ban on direct corporate contributions] and *Citizens United*, a case that addresses corporate independent expenditures, does not undermine *Beaumont*'s reasoning on this point."); *see also Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817 (2011) (recognizing contribution limits are subject to less demanding scrutiny than expenditure limits).

different from the prohibition at issue here. Section 10-10.107(3) imposes a ban, not a limit, on contributions from individuals, not corporations.[14] Moreover, those cases did not involve public employees, whose First Amendment rights the government may circumscribe to an extent that would be impermissible if they were nonemployees. *See Letter Carriers*, 413 U.S. at 564; *Mitchell*, 330 U.S. at 102; *Reeder*, 733 F.3d at 547. Nevertheless, those decisions and their rationales inform the balancing this Court must undertake in a significant way.

This Court must also consider the public's interest in the expression prevented by § 10.10-107(3). *See NTEU*, 513 U.S. at 468. The public, no doubt, has a considerable interest in hearing PPD members' views on law enforcement issues. *See Phila. Fire Fighters' Union*, 286 F. Supp. 2d at 482 (considering the public's interest in the views of Fire Department employees on matters within their specialized knowledge, such as fire safety). As previously discussed, however, the contributions ban in no way prevents PPD employees from personally expressing such views or even spending money to advocate for such views, as long as it is not in concert with a politician or partisan political group. Bd. of Ethics Reg. 8.17.[15] They may also aggregate

---

[14] Although in *Randall v. Sorrell*, 548 U.S. 230 (2006), the Supreme Court held a Vermont statute limiting individual contributions to $200 was unconstitutional, that decision provides little additional guidance in this case. In *Randall*, a three-Justice plurality reasoned that Vermont's comparatively low contribution ceiling prevented candidates from amassing resources necessary for an effective campaign, and thus failed to satisfy the lower level of scrutiny applied to contribution limits. *Id.* at 261-262. The plurality's analysis did not rely on, or even discuss, the First Amendment interests of individual contributors. Three concurring Justices opined that any contribution limit should be subject to strict scrutiny, *id.* at 264-266, while three dissenting Justices would have upheld the statute, *id.* at 273-281. In the case at bar, there is no argument that the ban on PPD contributions impacts candidates' ability to effectively campaign for office; therefore, the *Randall* plurality's rationale does not apply. Furthermore, the plurality and dissenting opinions demonstrate the Supreme Court continues to apply a lower level of scrutiny for restrictions on contributions.

[15] When *Philadelphia Fire Fighters' Union* was decided, the Board of Ethics Regulations had not yet been promulgated. Thus, that court considered only the broadly worded provision of § 10.10-107(3) forbidding contributions "for any political purpose whatever."

their voices—through the FOP for example—to emphasize an issue of particular public safety concern or endorse a candidate who they believe will best promote law enforcement interests. As far as the potential audiences are concerned, the ban only, though not insignificantly, prevents the public from receiving the messages of PPD employees, amplified through pooled contributions, concerning a candidate or political party.

Next, these interests must be weighed against the actual impact political contributions by PPD members have on the operation of City government. *See NTEU*, 513 U.S. at 468. In *NTEU*, a class of federal civil servants (Executive Branch employees below grade GS-16) challenged a law prohibiting them from receiving "honoraria"—compensation for making speeches or writing articles—even on topics unrelated to their jobs or the government. *Id.* at 459-60. That law was enacted largely to curtail the practice by members of Congress of accepting substantial honoraria for meeting with interest groups. *Id.* at 457-58, 472. Although the Court agreed the government's interest in preventing the abuse and perceived abuse of honoraria by members of Congress was "undeniably powerful," it held the ban was unconstitutional, citing the lack of any evidence of misconduct among the "vast rank and file of federal employees." *Id.* at 471-72. In *Swartzwelder*, the Third Circuit Court of Appeals rejected the City of Pittsburgh's argument that a policy requiring police to obtain authorization before providing expert testimony was necessary to avoid "the appearance that officer testimony is 'for sale'" because the City did not offer any evidence that officers were being paid for testifying. 297 F.3d at 239. The court in *Philadelphia Fire Fighters' Union*, in finding § 10.10-107(3)'s contributions ban against firefighters unconstitutional, similarly relied on the City's failure to present "persuasive evidence of how uniformed Fire Department employees' voluntary political

contributions would necessarily impact on the actual operation of government."  286 F. Supp. 2d at 482 (internal quotations and alterations omitted).

In contrast, the Supreme Court, in a line of cases upholding statutes barring government employees from taking an active part in political management or political campaigns, found the government had demonstrated that such participation sufficiently affected its operations.   In *United Public Workers of America (C.I.O.) v. Mitchell*, the Court analogized the ban on federal employee political activity in the "Hatch Act" to bans on public employee political contributions, which the Court had upheld in prior decisions.   330 U.S. at 96-98 (citing *Ex parte Curtis*, 106 U.S. 371 (1882) and *United States v. Wurzbach*, 280 U.S. 396 (1930)).   The Court found "[t]he conviction that an actively partisan governmental personnel threatens good administration has deepened since *Ex parte Curtis*.   Congress recognizes danger to the [civil] service in that political rather than official effort may earn advancement and to the public in that governmental favor may be channeled through political connections."  *Id.* at 97-98 (citing 86 Cong. Rec. 2338-2367 and additional pages (1940)).

The Court reaffirmed the validity of the Hatch Act in *Letter Carriers*, this time expressly weighing the government's interest in effective operation against its employees' First Amendment interests.   413 U.S. at 564.   The Court discussed the long history of federal civil service regulations limiting employee political activity and the events and concerns that shaped them.   *Id.* at 557-563; *see also NTEU*, 513 U.S. at 471 (distinguishing the honoraria ban from the Hatch Act because "Congress effectively designed the Hatch Act to combat *demonstrated ill effects* of Government employees' partisan political activities" (emphasis added)).   The Court highlighted the importance to the government of the impartial execution of the laws, which can be disrupted if federal employees feel beholden to their political party by virtue of their active

participation in the party.  *Letter Carriers*, 413 U.S. at 564-65.  It also observed that the appearance of impartial administration of the laws is equally important, particularly for maintaining the public's confidence in our system of government.  *Id.* at 565.  Another major concern was that the federal work force would "be employed to build a powerful, invincible, and perhaps corrupt political machine."  *Id.*  The Court cited this "sufficiently real" danger as the likely catalyst for the enactment of the Hatch Act in 1939, based on the experiences of the 1936 and 1938 federal election campaigns.  *Id.*  Lastly, the Court highlighted the interest in protecting federal employees from a system where hiring and advancement is conditioned on political performance.  *Id.* at 566 (citing testimony from the Chairman of the Civil Service Commission that the political activity prohibition "constitute[s] the most significant safeguard[] against coercion").  Weighing these considerations and the First Amendment interests of federal employees, the Court held the prohibitions on political activity in the Hatch Act were constitutional.  *Id.* at 567.  It also rejected a challenge that the prohibitions were overbroad and vague.  *Id.* at 579-80.  On the same day it issued the *Letter Carriers* decision, the Court decided *Broadrick v. Oklahoma*, 413 U.S. 601 (1973), upholding Oklahoma's law prohibiting political activity by its civil servants.  The Oklahoma law, patterned on the Hatch Act, was analogous to provisions enacted in all 50 states.  *Id.* at 603.

The City's justifications for the contributions ban mirror those highlighted by the Supreme Court in the Hatch Act cases.  Philadelphia's history of government corruption reveals these dangers are real and the need for the ban is compelling.  At the root of the political corruption problem was the entrenched patronage system permeating all City agencies, including the PPD.  With the ruling party wielding unchecked power, employment and advancement in the PPD was conditioned upon advancing the party's interests and contributing to party candidates.

This led to police involvement in voter coercion and politically tied criminal enterprises. The patronage system, which the contributions ban sought to eliminate, thus incentivized police officers to perform their jobs for the benefit of their political bosses rather than to impartially enforce the laws. *See Wachsman v. City of Dallas*, 704 F.2d 160, 166-67 (5th Cir. 1983) (upholding a ban on police contributions to political candidates challenged on First Amendment grounds and explaining how biased police conduct impairs the government's efficiency and the public's interest in being free from political discrimination). The PPD's biased enforcement of the laws not only threatened the imperative government objective of public safety, but also impaired the public's trust in the officers whose duty it was to protect them. The ban, therefore, sought also to rebuild public confidence in the PPD and City government. *See Wachsman*, 704 F.2d at 166-67; *Pollard v. Bd. of Police Comm'rs*, 665 S.W.2d 333, 336 (Mo. 1984) (rejecting a First Amendment challenge to a ban on political contributions by police officers and explaining the ban "additionally serves to proclaim that police protection will be available to the public, free from political overtones, and that the police will deal impartially with all who give them concern").[16] The contributions ban, in concert with civil service reforms and provisions designed to insulate City agencies from political influences, *see* 351 Pa. Code, Arts. VII & X, also aimed to dismantle what had certainly become a powerful and corrupt "political machine." *See* Charter History at 1 (referring to Philadelphia City government as a political machine); Shore Report at 4 (same); *see also Letter Carriers*, 413 U.S. at 565.

Another expressed justification for the ban was to shield PPD members from the practice of forced contributions. Pa. Legis. Journal – Senate, May 7, 1919, at 1746. The City has an interest "as important as any other" in ensuring that "employment and advancement in the [PPD]

---

[16] Courts generally are obliged to defer to legislative determinations regarding the appearances of impropriety. *NTEU*, 513 U.S. at 476.

not depend on political performance, and at the same time [in] mak[ing] sure that [PPD] employees [are] free from pressure and from express or tacit invitation to vote in a certain way or perform political chores in order to curry favor with their superiors rather than to act out their own beliefs." *Letter Carriers*, 413 U.S. at 566.  In this sense, the contributions ban sought to protect PPD employees' rights to political expression and association rather than to restrict those rights. *See NTEU*, 513 U.S. at 471 (distinguishing Hatch Act restrictions from the honoraria ban because the Hatch Act sough to protect rather than restrict free expression).  In *Pollard v. Board of Police Commissioners*, the Supreme Court of Missouri upheld a police contributions ban, similar to the ban here, enacted in part to end the practice of compulsory political contributions from public employees, which the legislature viewed as "important to a scheme of political control."  665 S.W.2d at 336.  The court recognized the compelling interest in protecting police from political interference in their duties and personal affiliations.  *Id.*; *see also Reeder*, 733 F.2d at 543 (rejecting First Amendment challenge to the same contributions ban in *Pollard* and agreeing with *Pollard*'s analysis); *Wachsman*, 704 F.2d at 166 (recognizing important government interest in police being free from political pressure in executing their duty).

Considering the demonstrated ill effects of police political contributions on the City, the public, and members of the PPD, the City's compelling interest in preventing these harms outweighs the somewhat narrow First Amendment interests of current and future PPD employees in making such contributions, and of the public in hearing their messages as they are communicated through such contributions.  Plaintiffs argue the City has failed to demonstrate that the dangers of undue political influence apparent when the ban was enacted still exist today. The City logically responds that the wane in police corruption over the last 60 years is due to the success of the ban.  It is impossible to determine the degree to which the contributions ban has

reduced and continues to ward off endemic corruption in City government and the PPD, although the likely answer is that Philadelphia's era of machine politics ended as a result of the combined effects of several measures, including civil service reforms, laws insulating government administration from political forces, as well as the challenged ban. While "the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist," *United States v. Carolene Products Co.*, 304 U.S. 144, 153 (1938), the record before this Court does not demonstrate that the threat of political corruption has been eliminated. On the contrary, as the City points out, and as anyone who has followed Philadelphia news over the last decade knows, corruption within City government, including within the PPD, remains a major concern. *See* City's Resp. Exs. B & C.

In *Letter Carriers*, the Supreme Court upheld the constitutionality of a provision in the Hatch Act enacted over forty years before its decision in 1973. 413 U.S. at 559-60. Moreover, the Court specifically relied on the government concern arising during the elections in the 1930s that federal employees might become a powerful political army. *Id.* at 565-66. As the Court aptly stated, "[p]erhaps Congress at some time will come to a different view of the realities of political life and Government service; but that is its current view of the matter, and we are not now in any position to dispute it. Nor, in our view, does the Constitution forbid it." *Id.* at 567. This wisdom applies equally here. Whether the current state of politics and government in Philadelphia renders the ban unnecessary is a question best resolved by City legislators and the voters.

Having determined the dangers resulting from PPD members' political contributions justify the restriction in § 10.10-107(3), the ban still must be shown to "alleviate these harms in a direct and material way," and be a "reasonable response to the posited harms." *NTEU*, 513 U.S.

at 475-76.  The ban meets these requirements.  In enacting this provision, the City identified one

of the means through which the corrupt patronage system was sustained—compelled political

contributions from PPD members—and cut off that source of party control.  Moreover, the ban

does not suffer from any of the tailoring defects cited in the *NTEU* and *Swartzwelder* cases.  The

central flaw of the honoraria ban in *NTEU* was that the main rationale for the law—that high-

ranking officials might abuse their power by accepting payment for unofficial speeches—simply

did not apply to rank and file government employees subject to the prohibition.  513 U.S. at 473.

Similarly, in *Swartzwelder*, the court found the requirement that police officers' opinion

testimony be pre-approved was poorly suited to address any of the police department's asserted

interests.  For example, because the requirement applied only to opinion and not fact testimony,

the rule was poorly drawn to meet the department's professed interests in tracking the location of

its employees and preventing the disclosure of confidential information.  *Swartzwelder*, 297 F.3d

at 238-39.  In contrast, the contributions ban is a logical and narrowly drawn restriction that

successfully puts a stop to conduct which evidence shows contributed to systemic corruption.

Plaintiffs also argue the ban sweeps too broadly because it prohibits PPD members from

contributing to candidates through COPPAC, which they contend would insulate them from any

political pressure.  The justifications for prohibiting police contributions, however, apply equally

whether the contributions are direct or made through a conduit.  PPD members can be pressured

to make contributions to COPPAC just as they were pressured to make direct contributions. If

contributing to COPPAC can become a condition of hiring or advancement, it can lead to the

same kind of politically motivated law enforcement seen in the past.  That the COPPAC board

and the Executive Board of the FOP have ultimate discretion as to which candidate receives

contributions does not alter this conclusion.  A contribution from COPPAC is a symbolic show

of support from every FOP member who funds COPPAC, whether through a large donation or a small payroll deduction.  *See Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 495 (1985) (observing individuals who contribute to political action committees "obviously like the message they are hearing from these organizations and want to add their voices to that message; otherwise they would not part with their money"); *Pollard*, 665 S.W.2d at 341 ("With the large number of officers on a metropolitan police force, moreover, the aggregation of small donations could produce a substantial sum.  There was reason for the legislature to conclude that nothing short of a total ban would respond to the evils shown by the evidence.").  Thus, the risk of an appearance of improper political influence over the police also arises when contributions are made through COPPAC.  There is no difficulty, therefore, in determining the contributions ban in § 10.10-107(3) is a reasonable response to the dangers police contributions pose to the actual operation of City government.   Accordingly, the ban does not violate PPD employees' First Amendment rights.

Plaintiffs also argue the contributions ban violates their right to equal protection of the laws under the Fourteenth Amendment because it treats PPD employees differently than other City employees.  They argue because this class-based restriction impacts their "fundamental" First Amendment rights, it must satisfy the strict standard of being narrowly tailored to serve a compelling government interest.  *See Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("Classifications based on race or national origin, and classifications affecting fundamental rights, are given the most exacting scrutiny." (internal citations omitted)).   A virtually identical equal protection challenge was rejected by the Supreme Court in *Broadrick*.   The Court rejected the First Amendment challenge to Oklahoma's version of the Hatch Act, which applied to only certain state employees, and dismissed the equal protection claim in the following footnote:

21

> Appellants also claim that § 818 violates the Equal Protection Clause of the Fourteenth Amendment by singling out classified service employees for restrictions on partisan political expression while leaving unclassified personnel free from such restrictions.  The contention is somewhat odd in that the context of appellants' principal claim, which is that § 818 reaches too far rather than not far enough.  In any event, the legislature must have some leeway in determining which of its employment positions require restrictions on partisan political activities and which may be left unregulated.  See *McGowan v. Maryland*, 366 U.S. 420 (1961).  And a State can hardly be faulted for attempting to limit the positions upon which such restrictions are placed.

*Broadrick*, 413 U.S. at 607 n.5.  *Broadrick*'s holding suggests the applicable equal protection standard for laws restricting First Amendment rights of public employees is something less than "the most exacting scrutiny."[17]  Nevertheless, for the reasons set forth above, the City also has satisfied its burden to defeat an equal protection challenge under *Broadrick*.

Furthermore, there are obvious reasons for the City to impose greater restrictions on its police officers than on its other employees.  Because police are vital to protecting the public's safety and are granted the power to make arrests and use necessary force to carry out that duty, they must be held to a higher standard of conduct than other City employees, which may include broader restrictions on First Amendment activity.  *See O'Donnell v. Barry*, 148 F.3d 1126, 1135 (D.C. Cir. 1998) ("[B]ecause of the special degree of trust and discipline required in a police force there may be a stronger governmental interest in regulating the speech of police officers than in regulating the speech of other governmental employees."); *Reeder*, 733 F.2d at 547

---

[17] As discussed above, when a law restricting the rights of public employees is challenged on First Amendment grounds, courts subject the restriction to a less demanding review than they would if the restriction applied to the public because the government has a separate, unique interest in regulating its employees.  *See Pickering*, 391 U.S. at 568.  It would make no sense to subject the same law to a higher standard simply because the challenge is framed as an equal protection claim rather than a First Amendment claim.  After all, any law restricting First Amendment rights of public employees treats them differently than the general public.  It would be equally misguided to demand that a public employer wishing to impose a valid First Amendment restriction on a certain category of its employees either apply the restriction to all employees or show it meets a higher standard of scrutiny than required to pass First Amendment muster.

(reasoning that because police assume the duty to "keep the peace by force of arms if necessary . . . [a] state may demand of its police officers a more exacting standard of conduct"); *Vorbeck v. Schnicker*, 660 F.2d 1260, 1263 (8th Cir. 1981) (noting that because of their unique functions, police departments "must demand a high level of discipline and duty of their members in order to function effectively for the good of all members of society," and "it is essential that [police officers] be subject to many stringent rules and regulations which would not apply to other government agencies").  It is equally necessary that police officers avoid the appearance of having any motives other than protecting the public.  *Reeder*, 733 F.2d at 547 ("It is proper for a state to insist that the police be, and appear to be, above reproach . . . ."); *Pollard*, 665 S.W.2d at 336.  Based on these considerations and the history of police involvement in political corruption discussed above, the City has certainly demonstrated that the contributions ban serves a compelling interest and that PPD members require greater regulation than other City employees. The ban, therefore, does not deny Plaintiffs equal protection of the laws under the Fourteenth Amendment.

Plaintiffs equal protection challenge to the City's refusal to implement COPPAC payroll deductions also fails.  The Supreme Court has held the First Amendment "does not confer an affirmative right to use government payroll mechanisms for the purpose of obtaining funds for expression." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 355 (2009).  Accordingly, the City has demonstrated, without a doubt, a "rational basis" for disallowing the payroll deductions.  *See id.* at 359 (holding public employers need only demonstrate a rational basis to justify a denial of political payroll deductions).

Plaintiffs' claims under the Pennsylvania Constitution fail for the same reasons as their claims under the United States Constitution.  Pennsylvania courts reviewing constitutional

challenges "presume legislation to be constitutional absent a demonstration that the statute clearly, palpably, and plainly violates the Constitution." *DePaul v. Commonwealth*, 969 A.2d 536, 545 (Pa. 2009) (quotations omitted).  The party challenging the statute "must meet a heavy burden." *Id.*  "All doubts are to be resolved in favor of finding that the legislative enactment passes constitutional muster," and "statutes are to be construed whenever possible to uphold their constitutionality." *Id.* at 589 (quotations omitted).

Article I, Sections 7 and 20 of the Pennsylvania Constitution guarantee citizens the rights to free speech and association.  Section 7 provides broader protections to speech than the First Amendment in some contexts.  *Pap's A.M. v. City of Erie*, 812 A.2d 591, 605 (Pa. 2002).  For example, the Pennsylvania Supreme Court has held that a ban on political contributions by individuals affiliated with licensed gambling is subject to strict scrutiny.  *DePaul*, 969 A.2d at 592.  But Pennsylvania courts have also recognized the government's significant interest in regulating the political expression of its employees.  In *Commonwealth v. Stauffer*, 454 A.2d 1140 (Pa. Super. Ct. 1982), the Superior Court rejected a claim that a statute prohibiting civil service employees from soliciting political contributions from another public employee was an unlawful infringement of speech under the Pennsylvania and United States Constitutions.  Citing the Hatch Act cases, the court noted "[w]ithout a doubt, the government may place restrictions on the political activities of its employees in order to maintain their integrity and impartiality and thereby promote efficiency in the civil service."  *Id.* at 1144 (citing generally *Letter Carriers*, 413 U.S. 548, *Broadrick*, 413 U.S. 601, *Mitchell*, 330 U.S. 75, and *Ex Parte Curtis*, 106 U.S. 371); *accord Appeal of Chalk*, 272 A.2d 457, 460 (Pa. 1971).  Thus, Section 7 challenges by a public employee are examined under the analysis set forth in *Pickering*, which balances the interests of the public employee and the employer.  *Appeal of Chalk*, 272 A.2d at 460.

As the Pennsylvania Supreme Court has not spoken directly on the issue presented in this case, this Court must attempt to predict how it would resolve Plaintiffs' claim. *Gruber v. Owens-Illinois Inc.*, 899 F.2d 1366, 1369-70 (3d Cir. 1990). Considering that Section 7 challenges regarding restricted political speech by public employees, like analogous First Amendment challenges, are resolved by weighing the interests of the relevant stakeholders, this Court finds, for all the reasons discussed above, the contributions ban does not violate Plaintiffs' speech and associational rights under the Pennsylvania Constitution. *See Stauffer*, 454 A.2d at 1145 (rejecting free speech challenge to statute prohibiting political contribution solicitations by public employees); *cf. Commonwealth ex rel. Specter v. Moak*, 307 A.2d 884, 889 (Pa. 1973) (rejecting speech and association challenge to Philadelphia Home Rule Charter provision prohibiting City employees from maintaining City employment while running for City office, but analyzing it under the First Amendment and not expressly discussing Section 7); *Commonwealth v. Tiberi*, 361 A.2d 318, 321-22 (Pa. Super. Ct. 1976) (rejecting free speech challenge to law prohibiting public employees from demanding political assessments, but analyzing it under the First Amendment and not expressly discussing Section 7). Furthermore, even if the contributions ban were subject to the same level of scrutiny applied in *Depaul*, for the reasons set forth above, this Court finds the provision satisfies that burden as well. The ban, therefore, does not violate Plaintiffs' freedom of speech and association under the Pennsylvania Constitution.

Finally, equal protection challenges under Article I, Sections 1 and 26 of the Pennsylvania Constitution are analyzed under the same standards as Fourteenth Amendment equal protection claims. *Love v. Borough of Stroudsburg*, 597 A.2d 1137, 1139 (Pa. 1991). As a result, Plaintiffs' equal protection claim under the Pennsylvania Constitution also fails. Accordingly, judgment will be entered in favor of the City and against Plaintiffs on all counts.

An appropriate judgment follows.


BY THE COURT:


 /s/ Juan R. Sánchez_____
Juan R. Sánchez, J.